UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IVAN A WILLOUGHBY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) No. 1:13-cv-01241-SEB-MJD |
| CAROLYN W. COLVIN Acting | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Ivan Allen Willoughby ("Willoughby") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"). *See* 42 U.S.C. § 416. For the reasons set forth below, the Magistrate Judge recommends that the matter be **AFFIRMED**.

### I. Procedural History

Willoughby filed an application for SSI on October 26, 2010, alleging an onset of disability as of September 2, 2010.[1] Willoughby's application was denied initially on December 27, 2010 and denied on reconsideration on April 8, 2011. Willoughby timely requested a hearing, which was held before Administrative Law Judge Joseph L. Brinkley ("ALJ") by videoconference on May 15, 2012. The ALJ's July 10, 2012 decision also denied Willoughby's

---

[1] Although Willoughby alleges an onset date nearly two months prior to the date that he filed his application, SSI is not payable prior to the month subsequent to the month in which the application was filed, which in this matter is November of 2010. *See* 20 C.F.R. 416.335.

1

application SSI, and on July 16, 2013 the Appeals Council denied Willoughby's request for review, making the ALJ's decision the final decision for purposes of judicial review. Willoughby timely filed his Complaint with this Court on August 5, 2013.

## II. Factual Background and Medical History

Willoughby, now forty-eight years old, applied for SSI due to his schizoaffective disorder, high blood pressure, high cholesterol, lower back pain, arthritis, mental conditions, and learning disabilities.[2] [R. at 152.] In order to manage these conditions, Willoughby takes several medications, including perphenazine, an anti-psychotic; citalopram, an anti-depressant; doxepin, for depression and anxiety; and benztropine, to cope with the side effects of his psychiatric medications. [R. at 155.] In his disability report, Willoughby reported that, although his medication "keeps him worn out and prevents him from doing the things he would like to do," without taking his medication he would hear voices that tell him to do things and he becomes paranoid that people with come up behind him, making him susceptible to "acting out violently towards others." [R. at 158.] Although Willoughby reported an inability to be outside for prolonged periods of time due to the side effects of his medications, he reported being able to prepare some of his own meals, perform basic household chores, and take his scooter to run errands. [R. at 173-74.] Willoughby's limitations are mental and social, as he reported having trouble with memory, completing tasks, concentration, understanding, following instructions, and getting along with others—no physical limitations were checked. [R. at 176.]

In September of 2010, Willoughby began treatment at Centerstone for his psychological impairments. [R. at 237.] At his initial intake, Willoughby reported a history of drug and alcohol abuse in order to self-medicate, but he has been clean since 2003. [R. at 168 (clean), 237

---

[2] Because Willoughby only disputes the ALJ's findings regarding his mental impairments, the Court will narrow the scope of its discussion accordingly.

(history).] Also at Willoughby's initial intake, the clinician observed that, while Willoughby is in a safe and well structured environment with supportive family and is motivated and recognizes the needs of his mental illness, he needs to develop better coping strategies, to learn to control his anger, and to secure a steady income. [R. at 237-38.] Willoughby was diagnosed with schizoaffective disorder, bipolar type, with a GAF of 42 and given a care plan to spend more time with his family and friends or support group, to walk away from stressful situations, and to take medications as prescribed. [R, at 240-41, 248-49.] At his initial appointments, Willoughby was very concerned about running out of medication, as he had not yet applied for Medicaid and had difficulty finding work due to his criminal history, medication side effects like fatigue, and anger issues. [*See, e.g.*, R. at 262, 266.] After receiving a steady supply of medication and making efforts to take it regularly, Willoughby reported that the medications were working well, and he only suffers from his auditory hallucinations when in "highly stressful situations," such as crowded stores. [R. at 281.] At a following session the clinician observed that Willoughby was "hypervigilant" in the waiting room but seemed to relax upon entering the interview room, noting that Willoughby is not defensive or drug-seeking, instead reporting that Willoughby "seems to be a reliable historian" who does not exhibit delusional symptoms and is "future oriented and happy." [R. at 282.]

In November of 2010, Willoughby's treatment team at Centerstone completed a Report of Psychiatric Status. [R. at 291-96.] When asked about Willoughby's "current specific manifestations of the mental disorder," the team noted that Willoughby "endorses experiencing auditory hallucinations" and "exhibits symptoms of paranoia and becomes anxious when in situations around others," though he reports that taking his medication "helps with symptom control." [R. at 293-94.] When discussing Willoughby's functional capacity, the team noted that

he tries not to leave home "because he gets aggravated by people," he is "somewhat defensive regarding criticism and could be easily angered due to paranoia around others," and his auditory hallucinations "make it difficult to concentrate and complete tasks." [R. at 295.] Additionally, the team noted that Willoughby's medication makes him groggy, "making it difficult for him to perform tasks," and that he "becomes anxious in social environment [sic]" and can become "increasingly anxious and may become agitated" due to "paranoid symptoms." [*Id.*] However, the team also reported that they were "unable to determine" a current prognosis "due to chronicity of illness," adding that Willoughby "has been compliant with all treatment recommendations to date." [R. at 296.]

Several State Agency medical consultants have also submitted reports regarding Willoughby's mental impairments. First, in December of 2010 Dr. Pressner found that Willoughby has mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation. [R. at 315.] Without finding any marked limitations of Willoughby's scizoaffective disorder, Dr. Pressner checked that an RFC assessment was necessary. [R. at 305, 308.] In his comments, Dr. Pressner relied heavily on the Report of Psychiatric Status from Centerstone, writing that Willoughby "tends to isolate himself and stay at home," that he is "somewhat defensive regarding criticism and could be easily angered due to paranoia around others," that Willoughby's auditory hallucinations "make it difficult to concentrate," that his medications make him groggy, "making it difficult for him to perform tasks." [R. at 317.] Dr. Pressner further writes "give [treating source] controlling weight" and that Willoughby's "statements are credible." [*Id.*] In his mental RFC assessment, Dr. Pressner then found that Willoughby was only "markedly limited" in two out of twenty summary conclusions: (1) his

4

"ability to interact appropriately with the general public" and (2) his "ability to travel to unfamiliar places or use public transportation." [R. at 333-34.] In conclusion Dr. Pressner writes in depth:

> [Willoughby] is capable of understanding, remembering, and carrying out simple instructions. The information in [sic] file suggests that [he] has the intellectual wherewithal to make simple work related decisions, to remember locations, and to remember simple work-like procedures. [Willoughby] seems to have the cognitive abilities, and attention necessary to anticipate usual hazards in the work place.
>
> [Willoughby] seems to relate adequately to other people. Therefore it appears that [he] would be able to relate adequately to co-workers, and to work supervisors. Interpersonal conflicts on the job would probably be within normal limits for the population at large. However, [he] appears to be anxious around groups of strangers. Thus [Willoughby] could not work with the general public or in jobs which require intensive, interpersonal contact with others. [Willoughby] would appear to work best alone, in semi-isolation from others or as part of a small group. [Willoughby] could work with a supervisor who was normally considerate and positive, but would have problems with a supervisor who was often negative, critical, or quarrelsome.
>
> [Willoughby's] pace would be within normal limits except as limited by [his] physical problems. [Willoughby] should be able to attend to task [sic] for a two hour period of time although there may be problems with prolonged or intensive concentration. It appears that [he] is capable of maintaining a schedule. Any problems with tardiness or absenteeism would seem to be a matter of choice rather than the effects of [Willoughby's] mental disorder.
>
> The evidence suggests that [Willoughby] can understand, remember, and carry-out simple tasks. [Willoughby] can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. [Willoughby] can attend to task [sic] for sufficient periods of time to complete tasks. [Willoughby] can manage the stresses involved with simple work.

[R. at 335.] In April of 2011, State Agency medical consultant Dr. Kaldder reviewed and affirmed Dr. Pressner's mental RFC assessment, noting that Willoughby "did not allege worsening." [R. at 345.]

Willoughby continued treatment at Centerstone through the beginning of 2012. By February of 2011, Willoughby was "not endorsing ongoing auditory hallucinations" and did not

display signs of paranoia or delusions. [R. at 396.] When he began work as a truck mechanic Willoughby was able to take breaks to avoid others when he began to feel anxious and had some auditory hallucinations saying "watch," but reported improvement and work enjoyment and displayed no signs of hypervigilance or paranoia by May of 2011. [R. at 392-94.] By September of 2011, Willoughby reported doing well on the days he goes to work but has difficulty on unstructured days, like weekends, hearing voices and seeing shadows. [R. at 390.] In January of 2012, after his mother died, Willoughby had lost his job because he left early too often, and he was troubled by his increase in psychotic symptoms. [R. at 386.] By March of 2012, Willoughby was "doing fairly well" and was "able to keep symptoms minimally intrusive" with no side effects reported, though the clinician did acknowledge Willoughby's application for disability and wrote "I do believe that Ivan would have a difficult time holding a job or functioning in any situation that would require him to be daily in contact with others." [R. at 378.]

At his hearing in May of 2012, both Willoughby and a vocational expert (VE) testified. Willoughby testified that he began hearing voices when he was a child, but it got worse during his second divorce, at the age of twenty-three. [R. at 18.] Willoughby testified that when he was working part-time at the trucking company he washed parts and changed oil but would be sent home early when he started hearing voices, which got to be too much for his employer when Willoughby's mother died. [R. at 16-18.] Willoughby also testified that he is able to perform basic household chores at home [R. at 33], but he is prone to getting into fights when he is in public because the voices tell him to hurt people when he feels that he in being attacked [R. at 21-23]. The voices and shadows "come out," Willoughby testified, two or three times a week, but he is able to isolate himself and take his medication to avoid getting into trouble. [R. at 27-

30.] The VE then testified that an individual with Willoughby's limitations would be able to perform work as a Cleaner (i.e., in hospital or medical settings) or Vehicle Cleaner. [R. at 39.]

### III. Applicable Standard

To be eligible for SSI, a claimant must have a disability as defined by 42 U.S.C. § 416. Therein, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i). In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment that significantly limits her ability to perform basic work activities, he is not disabled; (3) if the Commissioner determines that the claimant's impairment meets any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, the claimant *is* disabled; (4) if the claimant is not found to be disabled at step three and he is able to perform his past relevant work, he is not disabled; (5) if the claimant can perform certain other available work, he is not disabled. 20 C.F.R. § 404.1520.

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The standard of substantial evidence is measured by whether "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000) (quoting *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)). This court may not reweigh the evidence or substitute its judgment for that of the ALJ, but may only determine whether or not substantial

7

evidence supports the ALJ's conclusion. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), but the ALJ must consider "all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; he must "build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

## IV. The ALJ's Decision

The ALJ first determined that Willoughby has not engaged in substantial gainful activity (SGA) since his date of application, as the average earnings of his work activity, $971.31 per month, did not exceed $1000 per month. [R. at 54.] At step two, the ALJ found that Willoughby's schizoaffective disorder, learning disorder, back pain, and knee pain are severe impairments that significantly interfere with his ability to perform basic work-related activities. [R. at 54-55.] However, at step three the ALJ found that Willoughby does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. [R. at 55-57.]

After step three but before step four, the ALJ, after "careful consideration of the entire record," determined that Willoughby has the residual functional capacity (RFC) to perform "medium work." [R. at 57.] However, the ALJ found the following limitations to Willoughby's ability to perform medium work:

> [He] must avoid concentrated exposure to workplace hazards including dangerous machinery and unprotected heights; is limited to simple, 1-2 step tasks and no more than superficial contact with the public; can only occasionally work in teams or tandem; must have little change in the work structure; and is limited to low stress, i.e., no assembly lines or production quotas.

[*Id*.] At step four, because Willoughby's brief employment did not clearly rise to the level of

8

substantial gainful activity, the ALJ found that Willoughby does not have past relevant work. [R. at 60.] However, at step five the ALJ found that there are jobs that exist in significant numbers in the national economy that Willoughby can perform, such as being a Cleaner (i.e., in hospital or medical settings) or Vehicle Cleaner. [R. at 60-61.] Based on these findings, the ALJ concluded that Willoughby is not disabled, as defined by the Act. [R. at 61.]

## V. Discussion

Willoughby asserts that the ALJ failed to consider two[3] opinions about the functional limitations of his schizoaffective disorder when making the RFC determination. [*See* Dkt. 17 at 13.] Specifically, Willoughby argues that the ALJ did not evaluate (1) "the opinions expressed in the treating source's Report of Psychiatric Status" or (2) "Dr. Pressner's opinion that the opinions expressed in the treating source's Report of Psychiatric Status should be given controlling weight." [Dkt. 17 at 14-16.] In response, the Commissioner asserts that the "opinions" to which Willoughby is referring are not "medical opinions" as defined by the Act and that the ultimate RFC determination is the ALJ's prerogative. [Dkt. 20 at 3-8.]

An individual's RFC is not a medical issue, but an administrative finding that is reserved to the Commissioner. S.S.R. 96-5p. "In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). When a treating physician submits a medical source statement, such a statement is entitled to "special significance," but an ALJ must additionally take into account "all of the other relevant evidence" of the record when making an RFC assessment—"Treating source opinions on issues reserved to the Commissioner will never be given controlling weight." S.S.R. 96-5p. Additionally, while the ALJ may not ignore evidence, he need not reduce all of

---

[3] Although Willoughby initially alleged that the ALJ failed to consider three opinions [Dkt. 17 at 4], he subsequently withdrew his third claim [Dkt. 21 at 1].

9

the evidence he considers in making his decision to writing. *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Only when there is "reason to believe that an ALJ ignored important evidence" does error exist. *Walters v. Astrue*, 444 Fed.Appx. 913, 917 (7th Cir. 2011).

Here, Willoughby first argues that the ALJ did not evaluate certain statements made in the Report of Psychiatric Status and that his failure to do so is material error that warrants remand. [Dkt. 17 at 14-15.] First, while the ALJ did not cite to the particular pages in the record to which Willoughby is referring, the "opinions" of his clinicians and doctors at Centerstone are, indeed addressed by the ALJ in making his RFC assessment: (1) "He felt agitated at times and was experiencing anxiety in stores and auditory hallucinations" (addressing the "opinion" that Willoughby "exhibits symptoms of paranoia and becomes anxious when in situations around others"); (2) "He reported a history of hearing voices and paranoia, and said that his medications 'help tremendously'" (addressing the "opinion" that Willoughby "experiences auditory hallucinations, which make it difficult for him to concentrate and complete tasks"); (3) "[Willoughby] was able to work for a number of months, and there is no suggestion that he was unable to perform his duties due to sedation or excessive sleepiness" (addressing the "opinion" that Willoughby "takes medication that makes him groggy, which makes it difficult for him to perform tasks"); and (4) "He did hear some voices telling him to hit others but he was not acting out on any commands and denied intent to harm himself or others" (addressing the "opinion" that Willoughby "becomes anxious in social environments, and may become agitated"). [R. at 58-59 (citing thoroughly to exhibits 2F and 17F, which are treatment records from Centerstone); Dkt. 17 at 14 (containing the "opinions" from the Report of Psychiatric Status from Centerstone that the ALJ allegedly ignored).] Thus, the Court does not find that there is "reason to believe that an ALJ ignored important evidence," and, pursuant to the standard sent for in *Walters*, error

does not exist in the ALJ's failure to cite to specific statements made in the Report of Psychiatric Status.

Second, Willoughby asserts that the ALJ did not evaluate State Agency medical consultant Dr. Pressner's notation that "the Centerstone treatment team's Report of Psychiatric Status should be given controlling weight" and that the ALJ's failure to do so is material error that warrants remand. [Dkt. 17 at 16.] First, the Court acknowledges that Dr. Pressner's Psychiatric Review Technique concludes with the note "Give ts (m100) controlling weight." [R. at 317.] However, even assuming that "ts" means Centerstone and "m100" refers to the Report of Psychiatric Status, Dr. Pressner's Psychiatric Review Technique form only aided the ALJ in determining whether Willoughby's impairments meet or medically equal a listed impairment, not in determining his RFC. *See* POMS § DI 24505.025 ("If the claimant has a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, then assess residual functional capacity"), *available at* https://secure.ssa.gov/poms.nsf/lnx/0424505025. It was Dr. Pressner's Mental Residual Functional Capacity Assessment that was intended to aid the ALJ in his RFC assessment, and Dr. Pressner's comments there concluded that Willoughby "seems to have the cognitive abilities, and attention necessary to anticipate usual hazards in the work place," that "[a]ny problems with tardiness or absenteeism would seem to be a matter of choice rather than the effects of [his] mental disorder," and that he "can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors." [R. at 335.] Willoughby is asking the Court to assume that Dr. Pressner meant to defer to Centerstone's Report of Psychiatric Status, but such an assumption would essentially override Dr. Pressner's own RFC assessment. Further, it is the duty of the **ALJ** to consider various medical opinions and establish their weight, not a medical consultant. *See* 20 C.F.R. 416.927. Accordingly, the ALJ did not err in his RFC

assessment by failing to evaluate Dr. Pressner's notation, and substantial evidence supports the ALJ's finding that Willoughby is not disabled according to the SSA.

## VI. Conclusion

For the aforementioned reasons, the Court should find that substantial evidence supports the ALJ's determination that Willoughby is not disabled. The Commissioner's decision should therefore be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure

Date: 07/07/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Timothy J. Vrana
tim@timvrana.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov